**PAINTON & COMPANY, Ltd., Plaintiff,**

v.

**BOURNS, INC., Defendant.**

**No. 68 Civ. 3834.**

United States District Court,
S. D. New York.

Feb. 4, 1970.

Baker, Nelson, Williams & Mitchell, New York City, for plaintiff.

Curtis, Morris & Safford, New York City, for defendant.

MOTLEY, District Judge.

### Opinion on Motion for Summary Judgment

Plaintiff, Painton & Company, Ltd. [Painton], is a British corporation with its principal place of business in England. It brought this action for declaratory judgment against defendant, Bourns, Inc. [Bourns], a California corporation.[1] Bourns has counterclaimed for injunctive as well as declaratory relief.[2] Painton and Bourns both manu-

---

1. In the complaint, Painton prays that the court enter judgment declaring that Painton:

1) may use permanently the drawings, etc. with the proviso that (a) royalty payments will be paid for conformity with Paragraph 6 of the 1962 contract; (b) the drawings, etc. will not be disclosed to third parties;
2) retain the drawings, etc., free of any claim by Bourns; and
3) have title quieted to the drawings, etc.

2. Bourns counterclaims for a declaratory judgment that after royalty payments will

facture and sell electronic components. The worm gear and lead screw potentiometers are a product of Bourns which Painton has been manufacturing abroad for ten years pursuant to a series of contracts between the two companies which have now come to an end except for the payment of royalties on certain models. The right of Painton to continue to manufacture these potentiometers free of Bourns' trade secret and patent claims is the subject of this suit. Jurisdiction is based on 28 U.S.C. §§ 1332, 2201, and 1655. The case is now before the court on the motion of both parties for summary judgment. The following facts appear to be undisputed.

The first contract between the parties was entered into in 1958. A second contract followed in 1960. The contract of 1962, which expired on October 24, 1968 forms the basis of this suit. Painton, pursuant to the 1962 contract, had the right to receive from Bourns and did receive drawings and instructions and engineering assistance [hereinafter called drawings, etc.] relating to the manufacture of various models of the worm gear and lead screw potentiometers. In return, Painton was obliged to pay royalties as specified. Painton also had the right to secure British or other patents at its own expense in Bourns' name and had the right to use them free of any British patent infringement claims for the term of the contract. One British patent was secured covering certain models (Nos. 224, 3010, 3052, and 3053).[3] Painton also had the right to use Bourns' trade mark and to sell in certain areas of the world. However, the instant controversy is limited to the right of Painton to continue to use the drawings, etc. to manufacture the various models, after expiration of the contract and payment of royalties due after expiration, free from any trade secret and patent claims.[4]

On August 31, 1968, just prior to the expiration of the 1962 contract, Bourns requested the return of the drawings upon expiration of the contract as to certain models upon which all required royalties had been paid. Painton has refused to return these drawings and has claimed a right to continue to manufacture and sell the potentiometers. Painton claims that the contract licensed the permanent use by it of the drawings, etc., free of patent infringement and trade secret claims (except to the extent of not disclosing this information to a third party) upon expiration of the contract.

*Trade Secret Claims*

It is undisputed that model Nos. 224, 3010, 3052, and 3053 embody features that are covered by British Patent No. 923,607. In Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), the Court held that a licensee is not estopped from contesting the validity of the patent and (more importantly for this case) that once a patent issues, regardless of what was the intention of the contracting parties, the patentee-licensor may not enforce its trade secret claims. *Lear* at 672–674, 89 S.Ct. 1902. Thus, regardless of the construction of the 1962 contract under California law,[5] California courts must

---

have (or have) stopped under Paragraph 6, Painton has no right to use the drawings, etc. Bourns also asks for an injunction against Painton, enjoining it from:

1) manufacturing those models for which royalty payments have or will have stopped,

2) requiring Painton to return the drawings, etc., used for manufacturing the models for which royalty payments have already terminated.

3. These are covered by British Patent No. 923,607.

4. Painton does not claim any right to continue to use Bourns' trademark.

5. Paragraph 23 of the 1962 contract stipulates that the contract is to be construed under California law that was in effect at the execution of the contract:
 The legal effect of this Agreement * * * shall be construed under the law of California in effect on execution hereof.
 1962 contract, Paragraph 23.

obey the dictates of the Supremacy Clause, follow federal law, and refuse to enforce defendant's trade secrets in respect to those models covered by a patent.

■ Pursuant to Paragraph 6 of the 1962 contract, Painton agreed to pay royalties on models for which no patent application had been or would be made. Painton is not required, however, to make any future payments. This court's enforcement of such an agreement would be contrary to our national patent law and policy, Lear v. Adkins, *supra*. Our patent policy of strict regulation of inventions would be undercut if inventors could enforce agreements for compensation for alleged secret ideas without being required to submit those ideas to the Patent Office, and, thereby, eventually have the ideas disclosed to the public. Furthermore, patent policy (reaffirmed by the holding in *Lear* that estoppel will not be a bar to challenging the validity of a patent, *Lear* at 655–671, 89 S.Ct. 1902) which allows compensation only for ideas which rise to the level of invention would be further undermined by the enforcement of such a contract, since compensation would be awarded for non-inventions. And if this court were to hold that before a state could enforce a trade secrets contract, the ideas must be found to be an invention as prescribed by the rigid requirements of federal patent law, inventors would be able to circumvent "the manner in which [inventions] may be protected." *Lear* at 677, 89 S.Ct. at 1914. Inventors would be encouraged to avoid filing applications altogether and contract for long licensing arrangements. The severely restricted area which the Supreme Court left open to applicable state law would become a yawning abyss. Fewer patent applications would be made. The Patent Office would soon have a less accurate view of the state of the art in a particular field. And state courts, rather than the Patent Office, would become the initial triers of whether a discovery is an invention.

■ For these reasons, this court holds that federal patent law requires an inventor to submit his ideas to the Patent Office before he can compel consideration for the use of his idea. The court, however, does not decide whether under California law an inventor, if he makes a patent application, can be compensated for his disclosure before the patent has issued. Lear, Inc. v. Adkins. *supra*, at 676–677, 89 S.Ct. 1902.[6] That question is not before this court.

There is an alternative ground for denying Bourns' counterclaim for an injunction enjoining Painton from continuing to manufacture nonpatented models and granting Painton's prayer to be free of any trade secret claims. The language of the 1962 contract, when properly interpreted, indicates that Painton could continue to use the drawings, etc. and to manufacture the unpatented potentiometer models in question.

In order to interpret the 1962 contract, it is necessary to focus upon the central question: Did Paragraph 6 describe the minimum royalties Painton was required to pay in return for the permanent use of the drawings and right to manufacture the related models, or did Paragraph 6 mean that upon ceasing to pay royalties, Painton must return the drawings,

---

6. In *Lear*, the majority did not decide whether the licensor could contract to be compensated for a licensee's pre-patent usage of the secret idea. But the majority did instruct the state courts to reassess state law in light of our federal patent law demands so that the competing demands of each are reconciled.

Justice Douglas, concurring, outlined our patent law "demands": "[Patent Laws] tightly regulate the kind of inventions that may be protected and the manner in which they may be protected." 295 U.S. at 677, 89 S.Ct. at 1914. Furthermore, "[t]he national policy expressed in the patent laws" favors "free competition and narrowly limit[s] monopoly." *Id. See* Sears, Roebuck & Co. v. Stiffel, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

etc., and stop production of potentiometers?[7]

■ Under California law, which applies here, "the intention of the parties as expressed in the contract is the source of contractual rights and duties."[8] Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co., 69 Cal. 2d 633, 69 Cal.Rptr. 561, 564, 442 P.2d 641 (1968); Cal.Civ.Code, § 1647; Cal. Code of Civ.P. § 1860. "Accordingly, rational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties. * * * Such evidence includes testimony as to the 'circumstances surrounding the making of the agreement * * *' so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.'" 69 Cal.Rptr. at 565, 442 P.2d at 645. *Accord*, § 1860.

■ Then the court must decide whether "the language of a contract in the light of all the circumstances, is 'fairly susceptible of either one of the two interpretations contended for * * *.' (Balfour v. Fresno C. & I. Co. (1895) 109 Cal. 221, 225, 41 P. 876, 877 * * *.)" 69 Cal.Rptr. at 566, 442 P. 2d at 646.

■ In this case, the court has made a careful study of the extensive communications between the parties, including previous contracts, letters, the proposed drafts of the 1962 contract, and the language of the 1962 contract. The court concludes that in light of all the circumstances, the language in Paragraph 6 is fairly susceptible of only one interpretation: Painton can continue manufacturing the potentiometer models as long as it wants; the termination date is to terminate payments, nothing more.

There is extrinsic evidence to support this conclusion. The letter of April 13, 1962, led off the negotiations. Bourns complained about the inadequacy of its royalty payments. To remedy this, Bourns wanted Painton, among other things, to pay royalties for "as long as Painton continued to manufacture the items."[9] Bourns continued to insist on indefinite royalty payments and an increase in the rate from 3½% to 5%. In the negotiations in Basle, Switzerland, a compromise was reached. The rate would be increased to 5%, but royalty payments would not be required on any one model after 4 years of substantial production.[10] (Paragraph 6). Bourns' May 14, 1965 letter indicates that Bourns contemplated continued manufacturing on the part of Painton since Bourns acknowledges that Painton would be competing against Bourns once the exclusive licensing arrangement ceased. The August 13, 1968 letter, which demanded return of the drawings, etc., is the first communication to Painton that Bourns expected Painton to stop manufacturing when Painton stopped paying royalties.

The language of the contract also supports the court's conclusion. The language indicates that Paragraph 6 can be interpreted to mean that the parties intended that Painton would continue to use the drawings, etc., to manufacture potentiometers. The crucial provision reads:

> * * * [A]lthough this Agreement may have been terminated, Painton shall pay the fees provided herein either through the termination date or for a four (4) year period after achieving a production rate of 500 pcs. per month on any given model other than "Flatpot", whichever date is later.

7. The crucial provisions of Paragraph 6 are quoted in the text, *infra*.

8. *See* ftn. 5, *supra*.

9. Letter of April 13, 1962, Painton's Exh. 23, at 3.

10. If substantial production were attained on any model more than four years before the termination date of the agreement, then Painton would still have to pay royalties, until the termination date.

By allowing Painton to trigger off the running of the 4 year termination date, Bourns is allowing Painton to determine how long it wants to make royalty payments. Bourns contends that the fee termination date was also the manufacture termination date. If this were so, why does the provision give Painton the control over whether it can continue manufacturing the models? All Painton has to do is to manufacture 499 pieces and it can manufacture the models indefinitely. The more logical explanation of this triggering provision is that Bourns wanted to insure that it would receive a minimum payment for the drawings, etc., and its promise not to compete. In short, Bourns did not want its royalties cut off until Painton had manufactured a substantial number of a particular model (more than 500 pieces over a four year period or when the contract terminates, whichever is later).

There is another relevant provision of the contract which requires analysis. Paragraph 8 provides:

* * * Flatpot, which was developed and marketed by Painton prior to entering into any negotiations with Bourns and not substantially modified since, will be subject to a fee of $2\frac{1}{2}\%$.

 "Flatpot" models, like the other models, were subject to royalty in part because Bourns agreed not to compete in Great Britain, Sweden, Belgium and Australia. Bourns had also agreed to refrain from prosecuting patent infringement claims against Painton in those countries. Painton, however, is not required to pay the $2\frac{1}{2}\%$ royalty fee after the termination date (Oct. 31, 1968) even if Painton was not producing over 500 pieces per month for four years before. Does Painton, who "developed and marketed" this product, have to stop production of this model with the termination of royalty payments? Surely not.[11] The termination date found in Paragraph 6 only relieves plaintiff from the responsibility of payment of the fees on the Flatpot model; it is clearly implied, looking at the contract as a whole, that Painton can continue to manufacture Flatpot models. Bourns does not contend otherwise. The cut-off date for Flatpot royalty payments is contained in the same sentence as the models in question. The only difference between their cut-off date and Flatpot's is that plaintiff is required to pay royalties for a longer time on the models in question (i. e., after Oct. 31, 1968) if a 500 piece per month production rate is not met before Oct. 31, 1964. If Bourns intended this provision to mean that Painton must stop manufacturing when it stopped payment, why didn't Bourns distinguish the Flatpot part from the other models? Similarly, the 1965 letter does not distinguish between competition from Flatpot models and competition from the others. Looking at Paragraph 6 in this light, it is implicit that Painton can continue manufacturing and selling these potentiometers, whether Flatpot models or others, and can use the drawings, etc., after the royalty payment cut-off date.[12]

11. Defendant never argues that Painton must stop manufacturing Flatpots. In fact, Bourns relies upon the prospect of their continued production to explain away Mr. Bourns' May 15, 1965 letter's reference to future competition.

12. Bourns contends that trade secret rights arose out of the confidential relationship that developed during the life of the Agreement. The court rejects that contention.
Federal patent policy, the court has held, will not allow state trade secret claims against a party who has expressly contracted for them where there has been no patent application. Therefore, federal patent policy will not allow Bourns to have a trade secret claim in tort for Painton's use of trade secrets that were obtained pursuant to that contract.
Bourns' argument fails under California law, without any reference to federal patent policy. Bourns argues that, even if Painton is required to pay only limited royalties for permanent use of its trade secrets under Paragraph 6 of the 1962 contract, Painton is still required to pay permanent royalties under Bourns' trade secret rights in tort. Such an argu-

*Patent Claims on Models 224, 3010, 3052, and 3053*

Plaintiff prays that the court declare plaintiff has title to the drawings, etc., free of any patent rights. Since the court has held that plaintiff can use the drawings, etc., free from any trade secret claims, the court must decide whether this means that there has been a sale of these drawings and that a buyer of drawings, etc., can use them free of the seller's patent claims. Assuming, without deciding, that there has been a sale of the drawings, etc., it does not follow that the sale implies that the buyer is entitled to a license under the seller's patents. If the intention of the parties is that the license would end as of a certain date, then the buyer cannot claim that he has an implied license after that date.

 In this case, the 1962 contract expressly dealt with the patent licensing question. Paragraph 13 gives plaintiff an exclusive license under any patents in the designated countries "for the period of [the] Agreement." Since the agreement sets forth an express license grant limited in time, a permanent license cannot be implied. *See* Cal.Civil Code § 1656. Furthermore, in the May 14, 1965 letter, Bourns makes clear its intention to prosecute its British patent rights fully against Painton. Painton never asserted in a reply to that letter that it was free from these patent claims.

Bourns' counterclaim praying that the court declare that it has a right to prosecute its patent rights will be treated as a demand for royalties under its British Patent No. 923,607. But patent claims "must be construed in the light of the specifications and drawings of the patent and file history of the patent's prosecution." Adkins v. Lear, Inc., 67 Cal.2d 882, 64 Cal.Rptr. 545, 561, 435 P.2d 321

ment is nothing but a disguised request for an upward revision of the consideration given to Bourns under the 1962 contract. California state law would not grant such a request, especially where, as here, the consideration has been substan-

337 (1968), reversed on other grounds, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

Since the court does not now have this evidence before it, defendant's motion for summary judgment on this question is denied.

tial. To rule otherwise, would be to go against California's strong policy of enforcement of the terms of the contract negotiated at arms length. *See e. g.,* Pacific Gas & Electric Co., *supra.*