# TIMELY PRODUCTS CORPORATION et al., Plaintiffs,

### Raphael J. Costanzo, Plaintiff-Appellant,

v.

### Stanley ARRON et al., Defendants-Appellees.

### No. 933, Docket 74–2455.

United States Court of Appeals, Second Circuit.

Argued May 22, 1975.

Decided Aug. 26, 1975.

Arthur T. Fattibene, Fairfield, Conn., for plaintiff-appellant.

Edward Kunin, Bridgeport, Conn., for defendants-appellees.

Ernest M. Junkins, Bridgeport, Conn., for defendants-appellees.

Before MULLIGAN and GURFEIN, Circuit Judges, and CONNER,* District Judge.

CONNER, District Judge:

This patent suit involves subject matter to warm the feet, if not the judicial heart. It is primarily an action for infringement of a patent of plaintiff Costanzo on an electrically heated sock in which defendants counterclaimed for infringement of two patents of defendant Stanley Arron covering alleged improvements on such socks, with the parties adding a welter of additional claims and counterclaims. The District Court (Thomas F. Murphy, *Senior Judge*) evenhandedly dismissed every claim and counterclaim. We affirm in all respects but two.

*Factual and Procedural Background*

Judge Murphy's painstaking and detailed memorandum is referred to for a fuller exposition of the factual background; for present purposes, the following brief summary will suffice:

Plaintiff Raphael Costanzo, an experienced electrical designer, though not a graduate engineer, and defendant Stanley Arron, whose background was in retail sales and merchandising, had been principals in a corporation formed to manufacture and market an electric boat stove. The effort aborted and the corporation was dissolved about September 1966. In connection with that enterprise, Costanzo and Arron had entered into an agreement which provided that the corporation would acquire no rights in any ideas or inventions of Costanzo.

During that association, and beginning about February 1964, Costanzo developed the heated sock which is the subject of his patent and disclosed it to Arron. They agreed to cooperate in exploiting it, initially by approaching potential manufacturers and disclosing it to them in confidence in an attempt to interest them in taking licenses.

On September 13, 1965, Costanzo filed the patent application which matured, on December 20, 1966, into his U.S. patent No. 3,293,405 (the Costanzo patent).

A little over a month later, on October 23, 1965, Arron filed an application for patent on asserted improvements in the Costanzo sock. When the Patent Office cited the Costanzo patent among the prior art on which his application was rejected, Arron overcame this reference by filing an affidavit under Rule 131 "swearing back" of the filing date of the Costanzo application, and on July 9, 1968 he was granted U.S. patent No. 3,392,264 (the Arron '264 patent) on this application.

On November 29, 1966 Arron filed a second application on a further asserted improvement; a continuation-in-part of this application, filed March 4, 1969, resulted in the grant, on August 18, 1970, of U.S. patent No. 3,524,965 (the Arron '965 patent).

On December 27, 1965, Costanzo entered into an exclusive license agreement with plaintiff Benjamin Hines, who organized Timely Products Corporation (Timely), to make and sell electric socks. Costanzo thereupon severed his relation with Arron, and revoked Arron's authority to promote the socks. Shortly thereafter, Arron granted to Seneca Knitting Mills (Seneca) a non-exclusive license to sell socks incorporating his alleged im-

* Of the United States District Court for the Southern District of New York, sitting by designation.

provements. This license was soon terminated because, according to defendants, of a threat by Timely to involve Seneca in litigation. Thereupon, in about March, 1966, Arron, with his mother and father, defendants Anna and Max Arron, formed defendant Visa-Therm Products, Inc. (Visa-Therm) to make and sell the socks. Timely and Visa-Therm have been active competitors since that time.

In addition to their patent infringement claim, plaintiffs charged that Arron's agreement with Seneca and defendants' subsequent production and sale of electric socks violated Arron's obligation of secrecy. Plaintiffs further charged defendants with violation of the antitrust laws by lowering the prices of their socks for the purpose of destroying Timely and eliminating it as a competitor. Defendants counterclaimed not only for infringement of the Arron patents but also for plaintiffs' alleged tortious interference with their contractual relations with Seneca, and for unfair competition in falsely charging their customers with infringement of the Costanzo patent.

At the trial, in support of their infringement claim, plaintiffs relied only upon Claim 2 of the Costanzo patent; in opposition, defendants relied principally on a defense of non-infringement. Perhaps not surprisingly in view of the Arron patents, defendants did not aggressively pursue their defense of obviousness. Nevertheless, Judge Murphy ruled the entire Costanzo patent invalid under 35 U.S.C. § 103 (Section 103) on the ground that the invention was obvious in view of the prior art; he thus found it unnecessary to reach the issue of infringement.

In support of their patent infringement counterclaim, defendants asserted all four claims of the Arron '264 patent and all ten claims of the '965 patent. Plaintiffs did not seriously contest infringement of these claims, but asserted that they are all invalid on the ground of obviousness, that the '264 patent is unenforceable on the ground of fraud in connection with the affidavit under Rule 131, and that the '965 patent is invalid on the further ground that the claimed invention was on sale in this country more than one year prior to the effective filing date of November 29, 1966. The District Court sustained both the obviousness and "on sale" defenses and ruled the Arron patents invalid; it also concluded that there was not fraud but unclean hands in connection with the Rule 131 affidavit and that the '264 patent is unenforceable for this additional reason. It also dismissed plaintiffs' trade secret and antitrust claims and defendants' counterclaims for interference with contractual relations and for unfair competition. Finally, it denied applications by both sides for their costs and attorneys' fees under 35 U.S.C. § 285.

Costanzo appealed from the ruling as to his patent and alleged trade secret, and from the denial of costs and attorneys' fees. Defendants appeal from all the rulings adverse to them.

### Validity of the Costanzo Patent
#### The claimed invention

Claim 2 of the Costanzo patent, which is set forth in full in the margin,[1] covers,

---

1. Claim 2 of the Costanzo patent reads as follows:

"2. In combination
(a) a woven sock having a toe portion, a heel portion and a connective leg portion,
(b) means defining a pocket adjacent [to] the upper end of said leg portion adapted to receive a low voltage battery of less than 6 volts,
(c) electrical non-conductive means defining a pocket in the toe portion of said sock,
(d) a heater disposed in said toe pocket,
(e) said heater including a flat resistor strip of electrical resistance material,
(f) radiation means connected in heat transfer relationship to said flat resistor strip for defining an expanded radiation surface for said heater,
(g) said radiation means including a pair of heat conducting sheets of material for sandwiching said resistor strip in heat transfer relationship there between,

in general terms, a heated sock having in the toe portion of its sole a heater consisting of a flat ribbon of resistance material connected in heat transfer relationship to a radiation means consisting of a pair of heat conducting strips having the resistance ribbon sandwiched between and electrically insulated from them, with the electrical heating current being supplied by a low voltage battery (e. g., a 1½-volt flashlight cell) carried in a fabric pouch formed at the upper edge of the cuff and electrically connected to the resistance ribbon by fine wires secured to the leg and foot portions of the sock. The elements or features which Costanzo now asserts to be new are the localization of the heating element at the toe portion of the sole of the sock and the use of a "low-voltage battery of less than 6 volts," which is sufficiently small to be carried in a pocket at the upper end of the leg portion of the sock.

*The prior art*

The principal items of prior art relied on by the District Court in concluding that the Costanzo invention was obvious are:

1. The battery heated socks produced and sold by Northern Electric Company from 1953 to 1972. The Northern Electric sock was powered by a 6-volt battery of the size used for electric lanterns, which was suspended from the wearer's belt and was connected to fine, insulated resistance wires in the sole portion of each sock by insulated wires running down inside the wearer's trouser legs.

2. The prior Winchell U.S. patent No. 3,079,486, which discloses, *inter alia,* an insulated oversock adapted to fit over a regular sock, the oversock having heating wires embedded in it, with a small battery of undisclosed voltage contained in a pocket at the upper edge of the ankle portion. There is no evidence that

(h) means joining said heat conducting strips together and electrically insulating said strips from said resistor strip,
(i) electrical conductors connecting said resistor strip in circuit to said battery, and

this device was ever commercialized, and there is considerable question about the practicability of the proposal to heat the entire foot and ankle by means of a battery of the size shown.

3. The prior Carrona U.S. patent No. 3,084,241, which discloses a heated vest or jacket with an interliner consisting of a thin ribbon resistance element sandwiched between thin sheets of electrical insulating material adhesively joined together.

*The differences from the prior art*

Even when considered together, these items of prior art do not specifically disclose the concept of confining the heating means to the toe portion of the sole of a sock, thereby reducing the power required and allowing the use of a battery so small that it is practical to support it on the cuff of the sock, eliminating the need for bothersome wires running down the wearer's leg and the attendant difficulties in putting on and removing the socks, as well as substantially reducing the cost of the socks and of the batteries.

*The obviousness of the invention*

█ Judge Murphy found these differences "insubstantial" and "obvious to anyone with ordinary skill in the art." The conclusion that the differences are "insubstantial" is questionable in view of the significant advantages in cost and convenience which these differences afford; moreover, the test of validity decreed by Section 103 is not the substantiality of the differences but the obviousness of the invention as a whole. *In re Buehler,* 515 F.2d 1134 (C.C.P.A.1975).

█ However, we are constrained to agree with Judge Murphy's conclusion that the invention was obvious to persons of ordinary skill in the art at the time it was made.

(j) means maintaining said conductors against the leg portion of said sock."

It is always difficult in evaluating an invention, particularly in a device as simple as that involved here, to avoid " 'slipping into use of hindsight' " and to "resist the temptation to read into the prior art the teachings of the invention in issue." *Graham v. John Deere Co.,* 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966). For that reason, Judge Learned Hand, in his landmark decision in *Reiner v. I. Leon Co.,* 285 F.2d 501 (2d Cir. 1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388, *reh. denied,* 366 U.S. 978, 81 S.Ct. 1918, 6 L.Ed.2d 1268 (1961), counselled that the only reliable way to resolve the issue of obviousness was by reference to the history of the art, including such "signposts" as

> "how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized  *  * ?"

285 F.2d at 504.

This decision was cited with approval by the Supreme Court in *Graham v. John Deere, supra,* 383 U.S. at 36, 86 S.Ct. 684, and was doubtless a major tributary of the Court's oft-quoted statement that

> "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17–18, 86 S.Ct. at 694.

In referring to such factors as "secondary considerations" the Court surely did not intend to depreciate their importance, but only to indicate that they are to be considered *after* a preliminary determination of the precise subject matter at issue has been completed:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary

skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S.Ct. at 694.

■ We can conceive of no better way to determine whether an invention would have been obvious to persons of ordinary skill in the art at the time than to see what such persons actually did or failed to do when they were confronted with the problem in the course of their work. If the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials, it is difficult to see how a court could conclude that the invention was "obvious" to such persons at the time.

However, no such evidence exists in this case. The record does not reflect that anyone ever specifically attempted to develop a sock which could be heated by a battery small enough to be carried on the sock itself, thereby obviating the annoyance of wires extending up the legs to a belt-supported battery. The generalized efforts to improve the Northern Electric sock, in which the entire sole of the foot is heated, do not represent unsuccessful efforts to develop a sock with a self-contained power source.

It would seem obvious to anyone, including even rank outsiders to the art, that if the heated portion of the sock is substantially reduced, the power required, and accordingly the size of the battery, will be proportionately reduced, even to the point where the battery can be carried on the sock itself. It would seem equally obvious to anyone who ever had cold feet, which is to say everyone, that if only a small portion of the foot is to be heated, the heat could most advantageously be localized at the toes, the focus of the discomfort sought to be alleviated.

This is concededly a hindsight rationalization of the invention, which tacitly assumes that someone has first perceived, as a desirable goal, reduction of the size of the battery to a point where it can be supported on the sock. This is one of the not infrequent cases where the inventor's real contribution lies in visualizing a desirable result which, once perceived, is easily realized. There may be cases where the perception of a desirable and easily achievable goal raises the overall level of ingenuity required above the statutory minimum, but this is clearly not one of them. Indeed, the prior Winchell patent implicitly recognized the desirability of mounting the batteries on or at least directly overlying the sock or other article of clothing to be heated, thereby eliminating the need for external wiring. No skill above the norm of the calling was required to render Winchell's concept practicable by restricting the area heated.

*Evidentiary value of commercial success*

Plaintiffs argue that the nonobviousness of the invention is demonstrated by its commercial success, which involved supplanting the Northern Electric sock in public acceptance and eventually driving it from the market altogether.

■ However, as this Court stated in *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 1135 (2d Cir. 1974), and *Formal Fashions, Inc. v. Braiman Bows, Inc.*, 369 F.2d 536, 539 (2d Cir. 1966), commercial success cannot overcome a clear showing of obviousness, and this is particularly true where, as here, there is doubt whether plaintiffs' commercial product incorporates the invention as actually claimed.

Defendants vigorously contend that neither their accused socks nor even plaintiffs' own socks incorporate a heating element having "radiation means including a pair of heat conducting sheets of material for sandwiching said resistor strip in heat transfer relationship between them," as called for in Claim 2. Defendants' socks and all but the earliest model of plaintiffs' socks use nylon strips instead of the aluminum foil strips disclosed in the patent specification. There is much persuasiveness in defendants' argument that their nylon strips cannot, without rendering the words so broad as to be superfluous, be termed a "heat conducting" material forming a "radiation means." However, in view of our ruling that Costanzo's invention was obvious, even assuming its commercial success, it is unnecessary for us to consider whether Claim 2 is readable either on defendants' socks or on plaintiffs' own socks.

*Admissibility of Costanzo's foreign patents*

■ Plaintiffs further complain about the District Court's exclusion from evidence on nine patents which were issued on Costanzo's invention in various foreign countries, and assert that these corresponding foreign patents are strong evidence of nonobviousness. We are aware of no case, and plaintiffs have conceded that they know of none, which has ruled in plaintiffs' favor on this point. There is considerable precedent to the contrary. Apart from the probable differences between Claim 2 of the U.S. patent here in suit and the claims of the foreign patents, the standards of patentability vary widely from country to country; some countries, including France, one of the nine countries involved here, have only what amounts to a registration system with no examination even as to novelty, much less to level of ingenuity. The presumption of validity which the issuance of the U.S. patent confers, 35 U.S.C. § 282, is a real one, *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 132–33 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), which does not require nor admit of augmentation by proof of the issuance of corresponding foreign patents, *Application of Goodman*, 476 F.2d 1365, 1369 (C.C.P.A.

1973); *Application of Dulberg,* 472 F.2d 1394, 1398 (C.C.P.A.1973).

We therefore conclude that Claim 2 of the Costanzo patent, the only claim in suit, is invalid.

### The claims not in suit

■ Plaintiffs complain that the District Court erred in ruling the entire Costanzo patent invalid when only one of its four claims was in suit. In this respect, at least, plaintiffs are correct. Each of the claims constitutes in effect a separate patent whose validity is independent of that of the remaining claims. A court may not pass upon the validity of claims which were not put in issue, either by a claim of infringement or by a counterclaim for a declaration of invalidity. *Felburn v. New York Central Railroad Co.,* 350 F.2d 416, 420 (6th Cir. 1965), *cert. denied,* 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966).

### Validity and Enforceability of the Arron '264 Patent

#### The patented invention

The four claims of the Arron '264 patent, which are set forth in full in the margin,[2] cover an alleged improvement on the Costanzo sock, in which the only changes are:

(1) the material covering the resistance ribbon is nonmetallic (e.g., nylon); claim 2 is further limited to a textile material; and

(2) the heating element extends only along the part of the sock which is adapted to underlie the *base* of the wearer's toes.

#### The prior art

■ Before the District Court, defendants argued that the Costanzo patent was not a proper reference against the Arron '264 patent because, as alleged in the affidavit under Rule 131,[3] Arron had

**2.** The claims of the '264 patent are as follows:

"1. A stocking adapted to supply heat to the foot of a wearer comprising a foot covering portion and a contiguous leg covering portion, said foot covering portion including a sole having a part adapted to underlie the base of the wearer's toes, a heating element secured on the sole part and including an essentially straight length of electrical resistance ribbon having a size to be sufficiently thin to be flexible, a covering of flexible, non-metallic material on said ribbon, said heating element extending only on the part that is adapted to underlie the base of the wearer's toes, said covering material having low heat conductivity to decrease spreading heat from the ribbon to localize the heat at the base of the wearer's toes, a pair of conducting wires secured to the ends of the ribbon and means for connecting the wires to a low voltage source of electrical energy.

"2. The invention as defined in claim 1 in which the covering is of textile, fibrous material.

"3. The invention as defined in claim 1 in which the source of electrical energy is a low voltage battery, there is provided a pouch for containing the battery and securing means for securing the pouch to the stocking.

"4. The invention as defined in claim 1 in which adhesive means secures the covering

material on said heating element and in which the said covering material is made of textile fibres."

**3.** As of the time of Arron's affidavit, Rule 131 of the Rules of Practice of the Patent Office read as follows:

"131. *Affidavit of prior invention to overcome cited patent or publication.* (a) When any claim on an application is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, * * * and the applicant shall make oath as to facts showing a completion of the invention in this country before the filing date of the application on which the domestic patent issued * * * then the patent * * * cited shall not bar the grant of a patent to the applicant * * *.

"(b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from said date to a subsequent reduction to practice or to the filing of the application. Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or their absence satisfactorily explained."

conceived the claimed invention before September 13, 1965, the filing date of the Costanzo patent, and was continuously diligent in reducing it to practice. The District Court ruled that Arron had failed to establish a conception date prior to Costanzo's filing date, and defendants have not challenged that ruling in their briefs. Costanzo is thus part of the prior art against the '264 patent.

As previously mentioned, the use of a flexible, nonmetallic covering material for a ribbon heating element is taught by Carrona. And the use of a woven fabric strip for this purpose is taught by the prior Marick U.S. patent No. 2,277,-772, among a number of others.

## The obviousness of the invention

█ The only novel feature of the '264 patent is thus the localization of the heating means at the *base* of the toes, instead of at the toe area generally. Insofar as the slight shift in location is concerned, it is of questionable significance in view of the fact that the position of the sock on the foot is not precisely predictable, even when worn for the first time by a user for whom it was custom made, because of the unavoidable shifting of the sock on the foot occasioned by walking; much less so when worn by an indeterminate group of potential purchasers with different sizes and shapes of feet, with subsequent wearings affected by progressive shrinkage or other distortion due to laundering or cleaning. Insofar as the slight reduction in heated area is concerned, this is only a further application of the principle taught by Costanzo—an obvious expedient which falls far short of the minimum level of ingenuity required for patentability.

## Unclean hands and fraud

Plaintiffs further charged that the '264 patent is invalid or unenforceable because of fraud or, at the least, unclean hands in connection with the affidavit under Rule 131 which Arron filed

in an attempt to overcome the Costanzo patent as a reference. The affidavit was alleged to be false or misleading in three respects:

(1) The memorandum of conception attached as an exhibit was altered by adding, to the description of the heating element, the phrase "6 [inch] length"; (2) a sales slip for batteries, also attached as an exhibit, was altered by adding the words "alkaline cell"; and (3) Arron stated in the affidavit that he had been "associated with another" in his work prior to Costanzo's filing date, without mentioning that Costanzo himself was the other person referred to.

Applying the stringent "but for" test of materiality—i. e., whether the Patent Office would have rejected the application *but for* the misrepresentation or concealment—as recognized in *Norton v. Curtiss*, 433 F.2d 779, 795, 57 C.C.P.A. 1384 (1971), the District Court found no fraud. However, the Court concluded that Arron had acted in bad faith disregard of the duty of absolute candor he owed to the Patent Office, *Kingsland v. Dorsey*, 338 U.S. 318, 319, 70 S.Ct. 123, 94 L.Ed. 123 (1949); *Norton v. Curtiss, supra*, 433 F.2d at 793–94, and that his "unclean hands" disentitled him to enforcement of the '264 patent, whether or not the patent would have been issued "but for" the deception. *SCM Corp. v. Radio Corp. of America*, 318 F.Supp. 433, 449 (S.D.N.Y.1970). See *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 881 (2d Cir. 1971).

█ There is indeed precedent in the decisions cited, among others, for a distinction between fraud, which invalidates a patent, and unclean hands, which renders it unenforceable. But where, as here, the unclean hands arose in connection with the prosecution of the patent application, so that the wrong cannot be purged while the patent remains in force, the distinction is without practical significance insofar as the consequences are concerned.[4] In either case, the only

---

**4.** After the original draft of this opinion was written, the opinion of Judge Wright in *In re*

*Multidistrict Litigation Involving Frost Patent,* 398 F.Supp. 1353 (D.Del.1975), was

value the patent has—the right to exclude others from the use of the invention during the patent term—is irreparably destroyed.

Thus the recognition of a defense of unclean hands distinct from one of fraud is significant only insofar as concerns the proof required; it effectively eliminates the "but for" requirement, which has been observed to constitute a formidable obstacle in the absence of the testimony of the responsible patent examiner. *SCM Corp. v. Radio Corp. of America, supra*, 318 F.Supp. at 448.

Even though we agree with Judge Murphy's statement that the alterations in the disclosure document and in the sales slip were of "minor importance," the same cannot be said of Arron's failure to disclose that Costanzo, the patentee of the prior patent whose filing date he was attempting to antedate, was the very person who cooperated in his alleged prior work. In choosing the awkwardly noncommittal expression "another" to refer to Costanzo, he surely was consciously withholding from the Patent Office a fact which he believed, for obvious reasons, might be considered relevant to his claim of priority over Costanzo.

The affidavit produced the desired result: the examiner withdrew Costanzo as a reference and concurrently or shortly thereafter allowed the Arron application. Judge Murphy stated that "it would be sheer speculation to conclude that *but for* the failure to reveal the association of Costanzo and Arron, the examiner would have refused to allow Arron to swear back of the Costanzo reference."

■ We do not share Judge Murphy's reticence in this respect. Arron concealed from the Patent Office not only

the fact that Costanzo was the person who had cooperated in his work prior to Costanzo's filing date; he concealed the even more important facts that the sock disclosed and claimed in Costanzo's patent had been conceived, reduced to practice and even offered for sale before he (Arron) started work on his alleged improvement, and that he knew all about the Costanzo sock and used it as the point of departure for his work. Thus he was well aware that, even though he might be able to swear back of Costanzo's *filing date*, he could not antedate Costanzo's *invention*. Costanzo's work was clearly part of the prior art from which Arron's alleged advance should have been measured. *Armour & Co. v. Swift & Co.*, 466 F.2d 767, 769–71 (7th Cir. 1972). By concealing his knowledge of Costanzo's sock, Arron caused the Patent Office to appraise his contribution from the reference point of an earlier state of the art, and thus erroneously to credit him with Costanzo's advance as well as his own.

■ For the reasons previously stated, we have no difficulty in concluding that the patent examiner would not have withdrawn Costanzo as a reference but for Arron's suppression of that information, and that the Arron '264 patent would not have issued but for such withdrawal. We thus conclude not only that the Arron '264 patent is unenforceable on the ground of unclean hands, as the District Court ruled, but also that it is invalid on the ground of fraud, as the District Court stopped short of ruling.

*Validity of the Arron '965 Patent*

*The claimed invention*

Claim 1, which is typical of the ten claims of the '965 patent, is set forth in full in the margin.[5] It covers a body

---

published, likewise commenting upon the lack of practical significance in this distinction.

5. Claim 1 of the '965 patent reads as follows:

"1. A body garment having a heating element to supply heat to a user comprising an elongate strip of electrical resistance ribbon,

two strips of flexible material with each strip being elongate and at least as long as said ribbon and having a width larger than the width of the ribbon, one of said strips being positioned on one side of said ribbon and the other strip being positioned on the other side of said ribbon, means adhesively

garment wherein the only differences from the sock disclosed in the Arron '264 patent are:

1) the heater ribbon is sandwiched between flexible strips of electrical insulating material which are secured together by adhesive at their abutting faces;

2) this heater assembly is secured to the garment by two rows of stitches respectively extending along the two longitudinal edge portions of the strips; and

3) a fabric covering overlying the heater element is secured to the garment by the same two rows of stitches.

### The prior art

Arron's own '264 patent discloses a ribbon resistance element completely enclosed in a folded plastic strip having adhesive at its inner faces. The prior Jacobsen U.S. patent No. 2,329,766 discloses flexible, woven heating tape secured to a garment by rows of stitches extending through the longitudinal edge portions of the tape. And the Costanzo patent discloses a covering of fabric overlying the heating element and secured to the sock by rows of stitches extending along its longitudinal edges.

### The obviousness of the invention

The District Court concluded that the '965 invention was obvious in view of the prior art. We agree. Nothing would seem more obvious than to take an insulation-covered heater ribbon as taught by Arron '264, to secure it to a garment by stitching along its longitudinal edges, as taught by Jacobsen, and to enclose it within a fabric covering also secured by stitching along its longitudinal edges as taught by Costanzo; nor would anything beyond the most routine

production economy be involved in using the same rows of stitching to secure both the heater element and the fabric cover.

### The "on sale" defense

The District Court ruled the '965 patent invalid on the further ground that the claimed invention was "on sale" more than a year prior to November 29, 1966, the filing date of the original application which resulted in that patent, contrary to the provisions of 35 U.S.C. § 102(b).

The evidence established that socks made as disclosed in Arron's earlier '264 patent were advertised in the November 1965 issue of Outdoor Life, which undoubtedly reached its readers before the critical date of November 29, 1965. The advertisement was placed by Alexander Sales, a mail order house whose proprietor, Emanual Piller, testified that at the same time he placed the ad, about mid-September 1965, Arron showed him samples of the socks and he gave Arron an order for them.

Defendants do not dispute these facts, but merely assert that they do not constitute placing the socks "on sale" within the meaning of Section 102(b), because the socks were not actually available for delivery until after the critical date. Plaintiffs do not assert that the socks were in stock when the Alexander Sales order was taken, but merely argue, without citation of authority, that the solicitation of orders for the socks constitutes placing the invention "on sale." In their reply brief, defendants rely on the line of cases, discussed hereinafter, ruling that an article is not placed "on sale" by accepting orders for it before the article is on hand ready for delivery.

securing together the abutting surfaces of the ribbon and the strips, electrical connecting means connected to said ribbon and extending downwardly from said strips, said strips being substantially wider than the ribbon, stitching means securing only the outer edge portions of the strips to a garment and including a row of stitching extending along each outer edge portion of the strips, said rows being spaced from and on either side of the ribbon, a fabric covering overlaying said element with the rows of stitches also securing said covering to said garment and in which the electrical connecting means includes a length of wire attached to each end of the ribbon, one of said wires being disposed between the fabric covering, the garment and the rows of stitching."

The fountainhead of this doctrinal stream was *McCreery Engineering Co. v. Massachusetts Fan Co.,* 195 F. 498 (1st Cir. 1912), in which the Court reasoned that the close juxtaposition of the two expressions "public use" and "on sale" in § 4886, Rev.St. (the predecessor of Section 102(b), which allowed a two-year grace period between public use or sale and filing), suggested the intent of Congress that executory contracts for sale should be treated like those for use:

"We are of the opinion that proof of a mere contract to construct from plans and to deliver in future a machine or manufacture not proven to have been previously completed, falls short of proof that the machine or invention was 'on sale.' The distinction between an executory contract to construct and to pass title in the future and putting an article 'on sale' is substantial and is not merely one of the 'witty diversities' of the law of sales. Especially is that distinction important when such an executory contract is for the manufacture or construction which constitutes the first reduction to practice.

"That inventors who have reduced their conceptions to the shape of drawings or descriptions and have endeavored to enlist capital by offering to construct and deliver a machine in the future should, by the display of drawings and offers to construct, be regarded as having placed the machine 'on sale,' would involve a departure from the intention of the patent statute as well as from the ordinary significance of language.

\* \* \* \* \* \*

"Both in sections 4920 and 4866, Rev.St. (U.S.Comp. St.1901, pp. 3382, 3394), the words 'public use or on sale' are coupled together.

\* \* \* \* \* \*

"No amount of public use within two years is of any effect even if in pursuance of a contract made before the two years. The putting 'on sale'

intended by the statute is more or less analogous to a public use, and has regard to actual and completed transactions, and not to agreements which contemplate both a future production and a future transfer of title." 195 F. at 501–502.

The mere coupling of the "public use" and "on sale" defenses in a single section seems a frail anchor for what became such an extensive line, but four years later, this Court, in its *per curiam* decision in *Burke Electric Co. v. Independent Pneumatic Tool Co.,* 234 F. 93 (2d Cir.), *cert. denied,* 241 U.S. 682, 36 S.Ct. 728, 60 L.Ed. 1234 (1916), was likewise persuaded by it, stating:

"The proofs in this case show that the patented motors were ordered two years and a few days before the application for the patent was filed, but were not delivered and could not have been delivered until a time within the two-year period. The question is as to the proper construction of the words 'not in public use or on sale' in Rev.St. § 4886 (Comp.St.1913, § 9430). The combination of the words indicates that the sale contemplated is such as creates an opportunity for present public use. \* \* \* The provision ought to be construed favorably to patentees. If patented articles are on hand ready to be delivered to any purchaser, they are on sale, whether any of them has been sold or not. But, if they are not, they cannot be said to be on sale within the meaning of the act, though the invention itself has ceased to be experimental and is complete. This certainly should be true of articles which can be carried in stock, like the motors in question. \* \* \* We incline to follow *McCreery v. [Massachusetts] Fan Co.,* 195 F. 498, 115 C.C.A. 408."

This Court has apparently not considered the matter since.

Indeed, it was some thirty years before the Court of Appeals for the First Circuit had occasion to confront the issue

again, in *B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co.*, 124 F.2d 95 (1st Cir. 1941), *cert. denied*, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219 (1942). After quoting extensively from its earlier decision in *McCreery*, and noting the intervening concurrence of this Court in *Burke*, it reconfirmed its earlier position.

This trilogy of *McCreery, Burke* and *Sturtevant* was cited and followed in a long line of lower court decisions, including *Connecticut Paper Products, Inc. v. New York Paper Co.*, 39 F.Supp. 127, 133–34 (D.Md.1941), *modified on other grounds*, 127 F.2d 423 (4th Cir. 1942); *F.E. Myers & Bros. Co. v. Goulds Pumps, Inc.*, 91 F.Supp. 475, 497, *modified on other grounds*, 92 F.Supp. 184 (W.D.N.Y. 1950); *Galland-Henning Mfg. Co. v. Dempster Bros. Inc.*, 315 F.Supp. 68, 79–80 (E.D.Tenn.1970).

However, in a number of cases, a sales solicitation which involved the display of operable samples of the invention has been ruled to constitute placing the invention "on sale," even though no production models were then available for delivery. *Amphenol Corp. v. General Time Corp.*, 397 F.2d 431, 436 (7th Cir. 1968); *J. L. Clark Mfg. Co. v. American Can Co.*, 256 F.Supp. 719, 730–35 (D.N.J. 1966); *Chicopee Mfg. Co. v. Columbus Fiber Mills Co.*, 165 F.Supp. 307, 323–26 (M.D.Ga.1958). There would be a logical basis for carving out such an exception to the "on hand" requirement, because the display of a complete and operative specimen of the invention would probably teach the art as much as would a public use or a printed publication, either of which triggers the running of the one-year grace period allowed by Section 102(b). And the recognition of such an exception would be dispositive of the present issue since Arron showed his socks to Piller in soliciting the Alexander Sales order. But the "on hand" doctrine itself has been so seriously questioned that we believe a more thorough reconsideration is in order.

In *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 814–18 (D.Del.1961), Chief Judge Wright, after a thoughtful analysis of the doctrine, rejected it altogether, with the possible exception of cases involving machines "tailor made" to the customer's order. He likewise found an analogy in the "public use" aspect of Section 102(b), but relied on a divergent line of cases of which this Court's decision in *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir.), *cert. denied*, 382 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615, *reh. denied*, 382 U.S. 881, 66 S.Ct. 1364, 90 L.Ed. 1648 (1946) is the archetype. There, Judge Learned Hand reasoned that an inventor should not be allowed to use an invention commercially, even though secretly, for more than one year prior to his application, because this would effectively extend the limited monopoly created by the patent laws. He thus concluded that a use for profit need not instruct the public in order to be a "public use." In *Philco*, Judge Wright reasoned that the solicitation of orders, even for goods to be produced later, would be "clearly a competitive use" and, if it did not start the running of the one-year grace period provided by Section 102(b), would be no less an effective "extension of the patent monopoly." 199 F.Supp. at 816.

In *Dart Industries, Inc. v. E. I. duPont de Nemours & Co.*, 489 F.2d 1359, 1365 (7th Cir. 1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974), the Court of Appeals for the Seventh Circuit recently reversed a decision of the District Court of Chicago which had cited and followed the "trilogy," 348 F.Supp. 1338, 1358 (E.D.Ill.1972), stating that:

"These cases are not followed in this circuit, see *Wende v. Horine*, 225 F. 501, 505 (7th Cir. 1915)."

That statement was unnecessary to the decision in *Dart*, because there the patent owner had not merely offered to sell but had actually sold small quantities of the patented molding compound to four different purchasers more than a year before the filing date. But, as the Court indicated in *Wende v. Horine*, it had ruled, a year before our decision in *Burke*, that the solicitation of orders

302

placed the invention "on sale" even though the goods were not then in stock.

In a searching analysis of this question, including the legislative policy underlying Section 102(b), an excellent article in the Stanford Law Review criticized the trilogy, arguing that its reasoning "fails both in theory and in practical application." Note, New Guidelines for Applying the On Sale Bar to Patentability, 24 Stan.L.Rev. 730, 736, 737 (1972). Indeed, in the opinion of that author, *Burke* has already been effectively overruled by this Court's decision in *Metallizing v. Kenyon, supra.*

■ We believe that the legislative history of Section 102(b), as reviewed in the article, supports Judge Wright's interpretation, including his reliance on our decision in *Metallizing,* more than it does the "on hand" requirement of the trilogy. We accordingly conclude that Section 102(b) bars an application for patent filed more than one year after the solicitation of an order for a specific article to be produced later, where the following requisites are present:

(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. *Frantz Mfg. Co. v. Phenix Mfg. Co.,* 457 F.2d 314, 320–21 (7th Cir. 1972); *Tool Research & Engineering Co. v. Honcor Corp.,* 367 F.2d 449, 454 (9th Cir. 1966), *cert. denied,* 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972, *reh. denied,* 389 U.S. 893, 88 S.Ct. 17, 19 L.Ed.2d 203 (1967). Complete readability of the claim on the thing offered is not required because whatever is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable. *Application of Foster,* 343 F.2d 980, 52 C.C.P.A. 1808 (1965), *cert. denied,* 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, *reh. denied,* 384 U.S. 934, 86 S.Ct. 1441, 16 L.Ed.2d 535 (1966).

(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice. *Hobbs v. Atomic Energy Commission,* 451 F.2d 849, 859 (5th Cir. 1971).

(3) Finally, the sale must be primarily for profit rather than for experimental purposes. In re *Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277 (5th Cir. 1974), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1975). See also *Dart Industries, Inc. v. E. I. duPont de Nemours & Co., supra,* 489 F.2d at 1366.

■ The Alexander Sales Transaction satisfies all three of these requirements.

There can be no serious question that, at the time Arron took the order from Alexander Sales, the sock offered had been made and successfully tested, and that his purpose was purely commercial exploitation. Although this sock was made in accordance with the disclosure of the Arron '264 patent and did not incorporate the modified construction covered by the '965 patent, we have already expressed our agreement with the District Court's conclusion that this modification was obvious within the meaning of Section 103. We therefore agree further that the '965 patent was invalid on the additional ground that the invention was "on sale" more than one year prior to the application therefor, contrary to the provisions of Section 102(b).

*Costanzo's Alleged Trade Secret*

The District Court's dismissal of plaintiffs' trade secret claim was based upon its finding of fact that Arron never agreed to treat the Costanzo sock as a trade secret and its conclusion of law that since Costanzo was a patentable article under 35 U.S.C. § 101, it could not be the subject of a trade secret.

We believe that the finding is not determinative and that the conclusion is erroneous.

■ Even assuming that Arron did not specifically promise to maintain the

Costanzo sock in confidence, the fact that both he and Costanzo exacted such undertakings from each of the prospective licensees to whom they disclosed the sock surely made him aware that it was the policy of his joint venture with Costanzo to treat it as a trade secret until a patent could be obtained on Costanzo's application. Moreover, Arron's relationship to Costanzo was one of mutual trust and confidence which imposed upon him the implied obligation not to subvert that policy.

As stated in Restatement of Torts § 757, at 13 (1939) [hereinafter Restatement],

> "[w]hether or not there is a breach of contract, the rule stated in this Section subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him. The chief example of a confidential relationship under this rule is the relationship of principal and agent * * *. Such is also the relationship between partners or other joint venturers."

Among the cases applying this rule are *Smith v. Dravo Corp.*, 203 F.2d 369, 376 (7th Cir. 1953), and *Hoeltke v. C. M. Kemp Mfg. Co.*, 80 F.2d 912, 922–23 (4th Cir.), *cert. denied*, 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395 (1936). See also R. Milgrim, Trade Secrets, § 5.03[7] (1975) [hereinafter Milgrim].

The District Court's conclusion that patentable subject matter cannot be a trade secret was based upon a misapplication of the ruling of the Supreme Court in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). What those cases actually ruled was that

> "When an article is unprotected by a patent or copyright, state law may not forbid others to copy that article." 376 U.S. at 237, 84 S.Ct. at 782.

These decisions have been erroneously interpreted by some courts as ruling that the patent and copyright laws pre-empted the entire field of intellectual property law and thus precluded state laws not only against copying of products on the market, but also against the unauthorized disclosure and use of trade secrets. See, *e.g., Painton & Co. v. Bourns, Inc.*, 309 F.Supp. 271 (S.D.N.Y. 1970), and *Kewanee Oil Co. v. Bicron Corp.*, 478 F.2d 1074 (6th Cir. 1973), which relied on the dissenting opinion of Justice Black in *Lear Inc. v. Adkins*, 395 U.S. 653 at 676–77, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

This Court, however, rejected this view when it reversed *Painton*, and the Supreme Court finally settled the matter when it reversed *Kewanee Oil*, ruling that "patent law does not pre-empt trade secret law." 416 U.S. 470, 492, 94 S.Ct. 1879, 1891, 40 L.Ed.2d 315 (1974).

We thus conclude that Costanzo did have a trade secret in the construction of his socks, and that Arron was obligated to protect it.

However, there still remains a serious question whether Arron's efforts to exploit the sock of his '264 patent by disclosing it to Seneca and to exploit the sock of his '965 patent by making and selling it himself constituted a breach of Arron's obligation to maintain the secrecy of the *Costanzo sock*. Unfortunately, neither party has briefed this question.

As previously discussed, the novelty of Costanzo's sock, at least insofar as concerns subject matter common to the Arron socks, lay in the confinement of the heating means to the portion of the sole of the sock underlying the toes, thereby sufficiently reducing the size of the battery required to enable it to be carried in a pouch on the cuff of the socks. The fact that we have ruled that this concept is not patentable does not mean that it cannot be the subject of a trade secret. *Kewanee Oil Co. v. Bicron Corp., supra*, 416 U.S. at 476, 94 S.Ct. 1879; Milgrim, *supra* § 2.08[2], at 2–53– 54; Restatement § 757, at 6–7.

During the course of prosecution of his patent application, Costanzo narrowed his claims to recite additional elements, such as the "radiation means in heat transfer relationship to [the] flat resistor strip for defining an expanded radiation surface for said heater." As we have already remarked, the presence of these added elements in defendants' socks is highly questionable.

But the subsequent limitation of the patent claims in order to obtain their allowance does not correspondingly limit the scope of the trade secret, for the aforementioned reason that trade secret protection is not restricted to patentable subject matter.

There can be no doubt that the exploitation of the Arron socks disclosed the concept of a limited heating area and a self-contained battery. However, the record does not make clear when these activities took place and the extent, if any, to which Costanzo was injured thereby.

The secret was disclosed by Costanzo himself when his patent issued on December 20, 1966. This cut off Costanzo's right to prevent use or disclosure by others, even including Arron. *Conmar Products Corp. v. Universal Slide Fastener Co.*, 172 F.2d 150, 155 (2d Cir. 1949).

Moreover, the concept had been publicly disclosed, at Costanzo's instance, even before that time, although exactly when is not clear. In February 1966, Costanzo's exclusive licensee Timely made 25 pairs of socks, but apparently only for test and developmental purposes. By June 1966, it had made 10,000 pairs and had prepared an advertising brochure which presumably was publicly distributed about that time. This would thus be the latest cutoff date for computing any damages resulting from Arron's unauthorized disclosure. In *Conmar, supra*, we expressly rejected the contention, which had been adopted in at least two other circuits, that because the violation of the obligation of secrecy had given a competitor a "head start" before the owner's own public disclosure, the competitor should be enjoined from the use of the secret, at least temporarily, after such disclosure. 172 F.2d at 155–56.

The damage inflicted on Costanzo by Arron's activities prior to the cutoff date would appear to be minimal. Seneca made some socks and had a brochure printed, but the project was abruptly terminated in March 1966, allegedly because of Timely's threat of litigation. The record does not reflect how many, if any, of the Seneca socks were sold. Shortly thereafter, Arron began manufacturing socks under the Visa-Therm name, but the record is similarly unclear as to whether any of these socks were sold before the cutoff date.

Costanzo would be entitled to whatever damages he sustained as a result of the sale of heated socks by Seneca and Arron prior to the cutoff date. Milgrim, *supra* § 7.08[3], at 7-161. But we cannot imagine that merely compensatory damages, whether computed on the basis of lost profits or any other recognized basis, could possibly amount to enough to pay the cost of an accounting. Nevertheless, Costanzo is entitled to such damages provided, of course, he is able to satisfy the District Court that the amount involved exceeds the *de minimis* level.

### Alleged Unfair Competition and Interference with Defendants' Contractual Relations with Seneca

The evidence established that Timely's attorney Arthur Fattibene contacted John Watkins, Vice President-Sales of Seneca, and also wrote to Alexander Sales and other potential customers of Seneca, charging that the socks made by Seneca infringed Costanzo's patent rights; thereafter the Seneca license agreement was cancelled.

Defendants charged that these activities constitute unfair competition and actionable interference with their contractual relations with Seneca because the claims of the Costanzo patent clearly did not cover the Seneca sock.

The District Court ruled that there was no evidence that Timely's charge of infringement was made in bad faith, and that, in any event, Seneca cancelled its agreement not because of that charge but because Arron had written a letter to Seneca cancelling their license for the stated reasons of their alleged inability to produce socks on a competitive basis and their allegedly inaccurate record keeping. In agreeing to the cancellation, Seneca accused Arron of breaching his warranty of patent rights in the sock.

On appeal, Arron relies on his testimony that Seneca requested that he write the letter of cancellation in order to forestall a possible suit by Arron for breach of contract, a request to which he was forced to accede lest Seneca refuse to pay him the sums theretofore accrued under the agreement.

Arron's argument is self-defeating, since he admits that, for reasons he found adequate at the time, he cancelled the Seneca agreement himself.

His contention that Seneca insisted on the cancellation because of Timely's infringement charges was readily susceptible of proof through the testimony of Watkins and the other Seneca officials concerned, but no such evidence was forthcoming.

■ Even if we were not bound by Rule 52(a), F.R.Civ.P., to accept the findings of the District Court "unless clearly erroneous," we would not be disposed to disagree with Judge Murphy's findings

that the charges of infringement were made in good faith and that the Seneca agreement was cancelled for reasons other than Timely's interference.

### Attorney's Fees

Both sides have appealed from the District Court's denial of any award of costs and attorney's fees.

■ ■ Judge Murphy exercised his discretion to deny attorney's fees for the stated reason that "the entire lawsuit on both sides was frivolous and vindictive." We have differed with his conclusions to the extent of ruling that Arron breached his obligation of confidentiality and that he was guilty of fraud in the prosecution of his application for the '264 patent. Although his ruling that Arron was guilty of unclean hands rendered the case "exceptional" and provided a basis for the discretionary allowance of attorney's fees·under 35 U.S.C. § 285, *Kahn v. Dynamics Corp. of America,* 508 F.2d 939, 945 (2d Cir. 1974), our present ruling of fraud provides an even stronger basis therefor. We therefore remand the case to the District Court for reconsideration of the denial of attorney's fees, so that the Court may exercise its discretion with due regard to the changed circumstances.

### Conclusion

The judgment of the District Court is affirmed in all respects except (1) the ruling of invalidity of Claims 1, 3 and 4 of the Costanzo patent is set aside and (2) the dismissal of the trade secret claim is reversed. The case is remanded to the District Court for further proceedings thereon consistent with this opinion.