### TRANS–WORLD DISPLAY CORPORATION, Plaintiff,

v.

### MECHTRONICS CORPORATION, Defendant.

#### No. 72 Civ. 4203 (CHT).

United States District Court, S. D. New York.

Sept. 26, 1977.

Breitenfeld & Levine, New York City, for plaintiff; Alan H. Levine, New York City, of counsel.

Parmelee, Johnson & Bollinger, Stamford, Conn., by Haynes N. Johnson, Stamford, Conn., for defendant; Joseph L. Lazaroff, Rowayton, Conn., Joseph C. Sullivan, Kane, Dalsimer, Kane, Sullivan, Jurucz & Goldstein, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action for patent infringement by the patentee, Trans-World Display Corporation ("Trans-World") against Mechtronics Corporation ("Mechtronics"), a direct competitor of Trans-World in the business of supplying point-of-purchase advertising materials.[1] Trans-World seeks a determination that its U.S. Patent No. 3,674,175, entitled "Multiple Size Package Display and Dispenser," has been and is being infringed by Mechtronics, and an injunction against further infringement. Trans-World also seeks an accounting of the number of infringing dispensers which have been sold by Mechtronics and an award of the profits which Trans-World lost due to such infringing sales. Finally, Trans-World seeks treble damages and attorneys' fees due to the bad faith of Mechtronics in substituting itself for Trans-World as the sole supplier of the patented dispensers to Eastman Kodak Company, the sole customer for the dispensers.

Mechtronics, in its answer and on the trial of the issues herein, predicated its defense generally on the following grounds: (1) the structure disclosed is a combination of old elements put together to form a package dispenser, producing no new function or synergistic effect, and is obvious under 35 U.S.C. § 103; (2) that Trans-World's dispenser was "on sale" more than one year prior to November 12, 1970, the

filing date of the patent application, which fact Trans-World failed to bring to the attention of the Patent Office, *id.* § 102(b); (3) that the patent application failed to disclose the "best mode" of carrying out the invention, *id.* § 112; (4) that the Mechtronics structure does not infringe Trans-World's patent; and (5) that Trans-World's title to the patent is defective.

### Invention

The invention covered by the patent comprises a rectangular housing having within it a number of vertical chambers, each adjustable in both width and depth by the use of partition units. Each chamber is intended to accommodate a stack of film boxes all of the same size, but the boxes stacked in an adjacent chamber may be of a different size. Thus a number of stacks of film boxes, each containing a different sized film box, may be accommodated according to the wishes of the storekeeper or other person setting up the display, limited only by the overall size of the housing. Despite the difference in the sizes of the various film boxes in the vertical chambers, the front faces of all the boxes in the dispenser are flush.

Supplied with the housing are a number of separate partition units, each of which comprises two long, narrow walls permanently joined together perpendicular to each other so that the unit has an L-shaped cross-section. When a partition is inserted into the housing, one of the long narrow walls forms a side wall of a vertical chamber, and the other long narrow wall forms the back wall of the same chamber. Each vertical chamber in the housing is the space between two successive partition units which form the side walls of the chamber.

Each partition unit has top and bottom tongues which slide within grooves in the top and bottom walls of the housing, the

---

1. Such advertising materials, as the name implies, are used in retail outlets where the goods which they promote are sold. The advertising materials are generally of two types: *displays*, which only advertise a particular product, and *merchandisers*, such as racks, which not only

advertise a product but also carry a supply of the product in a way which permits the customer, or the storekeeper, to take a product from the merchandiser at the time the product is being purchased. The patent of the present suit involves a *merchandiser*.

grooves extending parallel to each other and from side to side as one looks at the front of the unit. When each partition unit is placed into the housing, a particular groove in each of the top and bottom walls of the housing is selected, and the top and bottom tongues of the partition unit are inserted into these grooves. The particular pair of top and bottom grooves which is selected determines the position of the back wall of the partition unit and hence the depth of the chamber. The partition unit is then moved by sliding its tongues along the selected grooves until the side wall of the partition unit reaches the desired distance from the side wall of the preceding partition unit, thus determining the width of the vertical chamber. In this way, a number of vertical chambers are created within the housing, each chamber having a width and a depth corresponding to or slightly larger than the width and length of a particular size film box.

Finally, each partition unit has, in addition to the long narrow side and rear walls, a short top and bottom wall. Extending at an angle from the bottom wall to the rear wall of the partition unit is a ramp or "kick-plate" which serves to move the bottom-most film box forward from the stack and make it readily removable from the dispenser.

*Factual and Procedural Background*

Before proceeding with a discussion of the issues raised herein, it would appear essential to discuss in some detail the factual and procedural background of the case.

On August 21, 1969 Robert Engel ("Engel"), a sales vice-president of Trans-World, went to the principal office of Eastman Kodak Company ("Kodak") in Rochester, New York at the request of Hamilton Driggs ("Driggs"), National Displays Mana-

ger of Kodak. Trans-World was in the business of designing and producing point-of-purchase display materials for anybody using such materials and had previously supplied Kodak with such displays. At the meeting on August 21 Driggs asked Engel whether Trans-World could come up with a gravity feed-dispenser that would hold four or five different sized boxes of film such as the dispensers cigarette companies use for boxes of cigarettes, but which could be arranged according to the particular combination of film boxes desired by the dealer and would hold the boxes so that they were flush with the front of the display. Engel returned to his office and on the following day, Friday, August 22, 1969, prepared a design requisition for a metal display to hold dispensers, width 24″, depth 4″, and height 20″, with a divider for different widths of film, to display a product of four different sizes. The budget range was to be under $20 a piece for 5,000 units. (Pl. Exh. 2). On the same day Engel wrote Driggs that he hoped to have a brilliant solution within 10 days and that a model should be ready within two weeks. Following this, Engel conferred with an Alfred Eliot ("Eliot"), who was running Trans-World's art department, and they agreed that John Jaquish ("Jaquish"), an art director at Trans-World, was best qualified to work on the problem. A meeting was arranged attended by Engel, Jaquish, Eliot, and Robert Monacchio ("Monacchio"), from the production department.[2] Although no particular date is given, the meeting probably occurred on Monday, August 25, 1969. It was at this meeting, lasting less than an hour, that Jaquish developed his "concept."

Within a day or two of the August 25 meeting, or by August 27, Jaquish had the first model using grooves and a divider structure which embodied the principle of the invention and which was satisfactorily

---

2. Jaquish, Monacchio, and Eliot had all previously made commercial dispensers. Indeed Monacchio had made a dispenser for different size band-aids in which the partitions varied in depth and width with the products in some cases flush with the front of the dispenser. They were also acquainted with prior point-of-purchase dispensers having gravity feed with bottom removal of the stacked packages of different sizes, consisting of varying size compartments with flush front faces, partitions that could be varied in depth and width, and with "kick-plates" at the bottom to eject the packages. Furthermore, the use of dividers for different widths of film was thought of by Engel before the first meeting with Jaquish.

tested. (Pl.Exh. 3). Sometime during the period from August 27, 1969 and September 18, 1969 Ward Johnston ("Johnston"), an independent model maker employed by Trans-World, constructed a model which Trans-World claims no longer exists. The Court finds that this first Johnston model was the first prototype model, smaller in size than the ultimate invention but embodying all the elements of the patent. (Pl. Exh. 5). It was successfully tested and demonstrated by Trans-World for Kodak by September 18, 1969. Thereafter, on September 22, 1969, Engel sent a memo to Jaquish and Monacchio requesting a model to be completed as early as possible the following week and to be 24″ wide, 20″ high, with 18 dividers. He further noted that although Kodak had requested the model be made of wood, Trans-World should immediately investigate how it "could produce this unit in production." Engel closed by stating that he "would like to have a model as early as possible next week." (Pl.Exh. 4). Whether a 24″ × 20″ model was ever prepared at this time is in some dispute. Driggs recalled that a small prototype with adjustable partitions was demonstrated to him at least by September 18, that he considered it very workable, and then requested a full-scale model, which model, made of plastic, was personally delivered to him by Engel before October 10, 1969. (Driggs Depos. at 21–24, 25, 28–32). Since the prototype model (Pl.Exh. 5) is only 11″ wide, that model could not have been the 24″ wide model ordered by Engel on September 22, 1969. Accordingly, it seems clear that sometime before October 10, 1969 (probably October 8—Pl.Exh. 12) Driggs did receive a full-scale model which he demonstrated to various persons in the Kodak marketing divisions on October 24, 1969. This model has ceased to exist. However, the important fact is that the prototype model demonstrated to Kodak on September 18, 1969, while smaller than the production model, was functional, capable of dispensing at least four different sizes of film, and was adjustable for both width and depth. Further, it included all the elements of the patent: a housing, top and bottom

walls, grooves in the top and bottom walls for adjustment purposes, partitions with perpendicular sections (L-shaped) with top and bottom tongues to go into the grooves, the partitions being individually adjustable as to width and depth of the chamber and defining chambers for film or other packages, a flush face with openings at the bottom for removal of packages, and kick plates to eject the bottom packages. (Tr. at 216–20).

Following the demonstration meeting at Kodak on October 24, 1969, Kodak determined to go ahead with the project. It was recognized, however, that the dispenser would involve a sizable investment in tools and production costs, and that Kodak's budget for 1970 was not sufficient to pay for tools and buy a sizable quantity of the dispensers. Accordingly it was decided that appropriations in the 1970 budget would pay for formation of the tools required and that the delay in production would bring Kodak close to 1971 when orders for the dispensers could be placed. (Driggs Depos., November 29, 1973 at 31–33). It seems clear that Trans-World was aware of these budgetary considerations, since it did nothing on the project until January 1970 when, in response to a call from Driggs, a meeting was held on Friday, January 16, 1970 between Driggs and Engel. (Pl.Exh. 7; Tr. at 32). On the following Monday, January 19, Engel wrote Driggs thanking him for "getting the dispenser off the ground" and advising him that Trans-World was "estimating the display with the corrections discussed." (*Id.*) These "corrections" are set forth in a memorandum of the same date from Engel to Monacchio and Jaquish which suggests that the "corrections" were to be made to the model which Driggs had requested for the October 24, 1969 demonstration rather than to the earlier and smaller prototype. (Pl.Exh. 8). In this memorandum Engel emphasizes the necessity of immediately "estimating this job" so that Kodak "can start the paper work on giving [Trans-World] an order which [at Kodak] is traditionally a long drawn out affair." (*Id.* at 1). On February 2, 1970

Engel wrote Driggs quoting "on the vertical dispenser as per dummy submitted" noting that "this display cannot be estimated down to the penny until a final production model is made, depending upon your preference as to the method of manufacture." (Pl.Exh. 9 at 1). Engel further noted that he "would need approximately 10 days to two weeks to make up custom models for the MPFDA show." (*Id.* at 4).

The letter set forth two possible ways of manufacturing the dispensers, one to utilize wood primarily and the other molded plastic. Under the second alternative, two possible methods of production were set forth. Sometime between February 2 and June 22, 1970 Kodak decided the dispenser should be made of molded plastic. During this interval and around April 1970 Jaquish made full-size drawings of the dispenser and in the latter part of June 1970 a full size plastic model was completed which Engel took to Driggs on July 2, 1970 (Pl.Exh. 13). Three weeks later Engel sent Driggs a letter quoting the final specifications on the dispenser (Pl.Exh. 15), and on the following day, July 24, 1970 Kodak sent Trans-World a purchase order to cover a one-time charge in the sum of $46,000 to cover the cost of production tools. It is interesting to note that as early as February 2, 1970 Trans-World had estimated such cost as between $40,000 and $45,000 (Pl.Exh. 9). Trans-World invoiced Kodak for the tools on July

29, 1970 (Pl.Exh. 17). Thereafter Trans-World had a molder make engineering drawings from which mold drawings could be made and then, utilizing the engineering drawings, had a model made comprising an assembly of the various parts which would be molded. This work was completed in late September 1970 (Pl.Exh. 18).

Until it had actually made a definite sale, Trans-World deferred instructing its attorney to file any patent application. The application was not drafted until November 4, 1970 and was filed on November 12, 1970.

### Invalidity of the Patent

We come then to a consideration of the defenses asserted by defendant Mechtronics.

### The Structure is Obvious in Light of the Prior Art

Mechtronics contends that the structure disclosed by the patent (Pl.Exh. 32) ("Jaquish patent") is a combination of old structural elements put together to form a package dispenser, producing no new function or synergistic effect,[3] and is obvious[4] under 35 U.S.C. § 103. This contention is borne out by the evidence. First, the testimony of Jaquish, Engel, Eliot and Monacchio, the persons present at the brief meeting in August 1970 at which Jaquish

---

3. A combination patent using old elements is invalid if no new function results. *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Anderson's-Black Rock v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); *Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

A combination patent is invalid if each element simply performs its normal function and the totality of elements does not amount to an "invention." *Sakraida v. Ag Pro, Inc., supra; Anderson's-Black Rock v. Pavement Salvage Co., Inc., supra; Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., supra; Continental Can Co. v. Old Dominion Box Co.*, 393 F.2d 321 (2d Cir. 1968); *Blisscraft of Hollywood v. United Plastics*, 294 F.2d 694 (2d Cir. 1961).

Combination patents are scrutinized by the courts with a care proportioned to the difficulty

and improbability of finding invention in an assembly of old elements. *Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Co., supra; Julie Research Labs., Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131 (2d Cir. 1974); *General Radio Co. v. Kepco, Inc.*, 435 F.2d 135 (2d Cir. 1970), *cert. denied*, 402 U.S. 1008, 91 S.Ct. 2189, 29 L.Ed.2d 430 (1971).

4. A patent is invalid if the invention is obvious to one skilled in the art, 35 U.S.C. § 103. *Sakraida v. Ag Pro, Inc., supra; Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., supra; Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

A stringent test of obviousness for combination patents is applied. *Indiana Gen. Corp. v. Krystinel Corp.*, 421 F.2d 1023 (2d Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970).

developed his "concept" of the dispenser, shows that together those individuals were aware of the previous existence of virtually all the elements of the device ultimately embodied in the Jaquish patent, i. e., point-of-purchase dispensers having gravity feed with bottom removal of stacked packages of different sizes in varying size compartments, which compartments were created by partitions that could be varied in depth and width and which dispensers had flush front faces and were equipped with "kick-plates" at the bottom to eject the packages.[5]

Second, an examination of the prior art shows the existence therein of the elements of the Jaquish patent. For example, claim 1 of the Jaquish patent, the only independent claim therein, specifies "chambers corresponding in width and depth to various size packages" to be housed therein. Housing in the prior art Matheson patent 1,663,088 (Def.Exh. G–5) had this very same function, however. In addition, the Matheson dispenser (designed for photographic film) had a plurality of fixed mutually perpendicular partitions (i. e., L-shaped members) "individually positionable" to define the sizes of package columns. While such partitions in the Matheson device are individually positionable only during the initial setting-up of the dispenser, claim 1 of the Jaquish patent does not specify that more than one adjustment be made.[6] Indeed, since the partitions in the Jaquish patent were to hold known sizes of Kodak film, more than one adjustment would not appear likely.

It seems that what was "unique" to Jaquish about his invention was the use of a series of L-shaped partitions to "set up a series of chambers which can vary in many directions . . . capable of handling

products of varying width, depth and height."[7] (Tr. at 192). However, this feature is contained in a number of patents testified to at trial by James Wyatt, the defendant's witness:[8]

1. *U.S. Heselov 3,010,606*—Wyatt described the *Heselov* patent as "a merchandizer with separately positionable partition units. They are removable, L-shaped in one modification partition unit, and they are used to form chambers for various sizes of packages, in this case cigarette packages, in a gravity feed dispenser." (Tr. at 330; Def.Exhs. G–1 and G–2).

2. *U.S. Matheson 1,663,088*—Wyatt described the *Matheson* patent as "a gravity feed display receptacle" to be used for "the dispensing of various sizes of photographic film boxes." The partition units are L-shaped to vary the width and depth of the compartments. It serves every function of the Jaquish patent except it has only one-time adjustability. Its appearance is almost identical, even to having a "flush face." (Tr. at 336–39; Def.Exh. G–3).

3. *U.S. Pauley 1,046,488*—Wyatt described the *Pauley* patent as a ticket cabinet used for the dispensing of tickets, arranged in stacks, in chambers that have adjustable side and back parts. Grooves run from the front to the back to hold the side partitions in place. The ticket compartments can be adjusted for both depth and width with the stacked tickets flush with the front. (Tr. at 339–42; Def.Exh. G–4). The *Pauley* patent has every feature of the Jaquish patent except that its L-shaped partition is in two sections, not unitary such as, for example, in the *Heselov* patent.

4. *U.S. French 2,667,979*—Wyatt explained that the *French* patent is for a

---

5. *See* note 2 *supra*.

6. Making a known product adjustable or the mere adding of plurality of units to it is not a patentable improvement. *Alco Kar Kurb v. Ager*, 286 F.2d 931 (8th Cir. 1961); *In re Stevens*, 41 CCPA 864, 212 F.2d 197 (1954); *Oxford Filing Supply Co. v. Globe-Wernicke Co.*, 150 F.Supp. 35 (S.D.N.Y.1957).

7. *See* note 6 *supra*.

8. As discussed more fully below, none of these patents were considered by the Patent Office although at least one was known to the plaintiff but not disclosed in the patent application.

dispenser for books and has L-shaped partitions that are adjustable in width and depth for a chamber to hold the books for gravity feed. (Tr. at 342–46; Def.Exh. G–5).

5. *U.S. O'Conner 1,524,748*—Wyatt explained that the *O'Conner* patent is for a store display dispensing various sized packages by gravity feed, containing L-shaped partitions which are adjustable in width and depth to hold various sized packages.

Wyatt also cited other patents—U.S. *Schendorf* 3,333,732, U.S. *Karr* 945,126, U.S. *Baum* 3,360,091 and U.S. *Wilson* 3,034,683—to support his contention, with which the Court agrees, that the prior art showed a wealth of adjustable, mutually joined L-shaped partitions. Claim 1 of the Jaquish patent thus embodies only elements well known in the prior art and uses them only for their known functions.[9]

Furthermore, the structures of claims 2–6, 8 and 9—the only other claims which the Mechtronics device is said to infringe—also merely assemble elements which function exactly as they were known in the prior art and thus are equally flawed. Dependent claim 2 adds a front wall to define the front of the package columns. Yet, the *Matheson* patent uses a front wall for just this purpose. In fact, Kodak specified that the film cartons were to be held flush against a clear front.

As described in dependent claims 3, 4, 5 and 6, the Trans-World device has grooves or guides in the housing top and bottom walls to provide adjustment of partitions. Such grooves, having the same adjustment functions, exist in the prior art, e. g., in the *Pauley* patent 1,046,488, although the grooves in *Pauley* resemble the Mechtronics dispenser more than the Jaquish patent since the grooves in *Pauley* go from front-to-back whereas the claimed Jaquish grooves go from side-to-side.

Dependent claim 8 of the Jaquish patent calls for a front housing wall spaced above the bottom wall to allow packages to be dispensed through the lower front of the dispenser. The same structure, with the same purpose, is found in the *Matheson* patent. This claim and claim 9 are the only ones limiting the dispenser to bottom ("gravity-fed") dispensing.

Finally, dependent claim 9 of the Jaquish patent describes partition units with a "kick-out" member for pushing the lowermost package forward. Adjustable partition units with kick-out members, functioning exactly as set out in claim 9, existed in the prior art, e. g., the *Heselov* patent. In sum, then, the Jaquish patent fails to advance the state of the dispensing art.

The issuance of the Jaquish patent notwithstanding the considerable extent of the prior art was achieved by a combination of the poor independent search made by the Patent Office[10] and the failure of Jaquish

---

9. Claim 1 of the Jaquish patent cannot be sustained since it is vague and provides no structure by which the partitions are "individually positionable." In order for a claim to be sustained, it clearly must recite a structure or composition which is capable of performing its purported function. *Indiana Gen. Corp. v. Krystinel Corp.*, 297 F.Supp. 427, 441 (S.D.N.Y. 1969), aff'd, 421 F.2d 1023 (2d Cir.), *cert. denied*, 398 U.S. 928, 90 S.Ct. 820, 26 L.Ed.2d 91 (1970). Rather, the claim uses only functional limitations. The only structure for adjustment disclosed in the patent is a series of grooves running side-to-side of the dispenser (from right to left as one faces it). Furthermore, as will be discussed more fully hereinafter, although the patent specification does disclose a technique for adjustment of the dividers from one position to another, it does not disclose the best mode known for attaining adjustment, as required by 35 U.S.C. § 112.

10. Jaquish set forth the field in which his dispenser lay:

"This invention relates to devices for displaying and dispensing merchandise packages, and more particularly to such devices used in connection with packages having dimensions which differ from one another.

"Although the display and dispenser of this invention has been described above, and will be described below, in connection with boxes of photographic film, it is to be understood that the invention has much wider utility and may be used in *any* situation in which multiple size containers are to be stored and dispensed." (Emphasis added) (Pl.Exh. 32, Col. 1, lines 3–6, 50–56).

to inform that office of prior art which had been found by his patent attorneys.

The limited prior art relied upon by the Patent Office consisted of three United States Patents—*Sroduski* 2,272,682, *Olund* 2,208,470, and *Scher* 2,462,816—and two foreign patents—French 1,340,938 and Netherlands 300,684. (Def.Exhs. I & J). None of these patents incorporates a movable L-shaped partition, unlike many of the patents found by the defendant and discussed above. The plaintiff itself was aware of at least one of these patents—U.S. *Heselov* 3,010,606—as the result of a search made by its attorneys on or about October 20, 1969. Plaintiff's Answer to Interrogatory 1. Yet, the existence of this patent was not made known to the Patent Office, which did not find it independently. Furthermore, the patentee did not disclose the *Olund* patent to the Patent Office, which evidently located that patent on its own.

In this regard, a review of the prosecution of the patent application is of considerable interest. (Def.Exh. I). The original patent application listed some 14 claims, all of which were rejected by the Patent Office on January 13, 1972, primarily on the basis of the *Sroduski* patent showing separately movable partitions. As filed, the claims in the application described side and back partitions which could be separated from one another and moved *independently* in order to vary the width and depth of the article chamber; that is, there was no unitary L-shaped partition. However, as the patent disclosure still says, although each of the partitions are preferably formed as parts of an integral unit, separate partitions could be employed. (Pl.Exh. 32, Col. 4, lines 23–25). Thus, the patentee considers separate and integral partitions as equivalents. Because of this initial approach, the search made by the Patent Office needed to be directed solely to *any* pair of related partitions which could vary the width and depth of the chamber, and caused the rejection of

the claim on the basis of the *Sroduski* patent. In January 1972, the same month that the Patent Office rejected the claims of the Jaquish application, Trans-World learned that Kodak was going to purchase the alleged infringing device from Mechtronics. (Engel Depos. at 84–85). Thereafter, by amendment dated February 16, 1972, claim 1 in the application was cancelled, and what was to become claim 1 of the patent was substituted. While the original claim 1 provided for *separate* partitions individually adjustable to vary the width and depth of the chambers, the amended claim 1 required that the individual partition units be "fixed to each other." (Pl.Exh. 32, Col. 4, line 44). No further patents were cited by the Examiners, and a Notice of Allowance resulted.

### Trans-World's Dispenser was "On Sale" More Than One Year Prior to November 12, 1970

■ 35 U.S.C. § 102(b) deprives a person of his right to a patent if the invention was "on sale in this country, more than one year prior to the date of the application for patent in the United States." Trans-World argues that the specific article being offered for sale did not exist—was not "on-hand"—and so could not have been offered for sale.[11] However, present authority as established in this circuit in *Timely Products Corporation v. Arron*, 523 F.2d 288 (2d Cir. 1975), no longer requires that the goods be "on hand." That decision concluded, however, that section 102(b) does bar an application for a patent filed over a year after solicitation of an order for a specific article *to be produced later*, provided these requirements are met:

"(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale. Complete readability of the claim on the thing offered is not required because whatever

All of the prior art patents cited by defendant herein fall within this defined field.

11. "On sale" does not require an actual sale. *Amphenol Borg v. General Time*, 397 F.2d 431 (7th Cir. 1968); *Philco Corp. v. Admiral Corp.*,

199 F.Supp. 797 (D.Del.1961). An invention is "on sale" even if the prospective customer is tentative about making a buying decision. *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F.Supp. 859 (D.Del.1972).

is published (or on sale) more than one year prior to the filing of a patent application becomes part of the prior art over which the claim must be patentable.

(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable. This is simply another way of expressing the principle that an invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice.

(3) Finally, the sale must be primarily for profit rather than for experimental purposes." *Id.* at 302 (citations omitted).

In the present case, these criteria have been met. The patent application here was filed on November 12, 1970. The evidence shows that at least two crucial events had taken place before November 12, 1969, *i. e.*, more than one year before the application: (1) Trans-World had obtained a request from Kodak to re-design its film dispenser, the request including the proposed function, size and dollar limitations (Pl.Exh. 2; Tr. at 62, 270–71; Engel Depos. at 24, 29); (2) Trans-World had prepared and demonstrated to Kodak at least two working models (September 1969 model: Tr. 204–05, 69; Pl. Exh. 12; Pl.Interrog.Ans. 23; October 1969 model: Pl.Exh. 5; Def.Exh. A; Tr. at 27–28, 30, 81–82, 214, 70–73, 78, 94, 111, 131–33, 275). A clear preponderance of the evidence supports the finding that at least a half-size, fully-working model (Pl.Exh. 5) was in existence and demonstrated some weeks before the crucial date (although, as discussed above, the Court believes a full-size model was demonstrated), and that this model included all of the elements found in the patent. (Tr. at 216–19, 78–81).

By October 1969, Eliot, the chairman of Trans-World's Executive Committee, knew that the dispenser would operate satisfactorily and, from his prior experience, that it could be made into a production model. (Eliot Depos. at 50).

There is no question that Trans-World was trying to sell the dispenser to Kodak.

In September and October Kodak was advised that the dispenser could sell for under $20 a unit, and was given estimates as to tooling costs and unit costs in varying quantities. (Engel Affid.; Def.Exh. B, ¶ 4; Driggs Depos. at 30). After this, there was nothing more that Trans-World could do to effect a sale. It could only await Kodak's decision as to whether it wanted to buy and the specific artistic configurations, after which it could commence tooling for production in commercial quantities, which it did as soon as it received the order on June 1, 1970. As has been noted, Kodak's reason for delaying its decision was budgetary and had nothing to do with any question of feasibility or marketability.

Thus it is abundantly clear that the "on sale" criteria of *Timely Products, supra,* have been met: "(1) The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale." The September-October model (Pl. Exh. 5) contained all the elements of the invention. (Tr. at 216–19, 78–81, 274). "(2) The invention must have been tested sufficiently to verify that it is operable and commercially marketable." As has been shown, the dispenser had been reduced to practice, was operable, and Trans-World knew it could be put into production. "(3) Finally, the sale must be primarily for profit rather than for experimental purposes." No suggestion has been made that further experimentation was necessary with respect to any of the elements of the invention. In quoting prices and production costs Trans-World was clearly embarked on a sale primarily for profit. All these criteria were met prior to the crucial date of November 12, 1969. The patent, accordingly, was invalid.

*The Patent Fails to Reveal the Best Mode for Making the Dispenser*

■ 35 U.S.C. § 112 requires that "[t]he specification . . . shall set forth the best mode contemplated by the inventor of carrying out his invention." [12] As stated in

12. The best mode contemplated by the inventor for carrying out his invention must be disclosed. 35 U.S.C. § 112. Failure to do so has resulted in the invalidation of patents. *Dale*

*Flick-Reedy Corp. v. Hydro-Line Mfg. Co.,* 351 F.2d 546, 551 (7th Cir. 1965):

"To accept the monopoly and withhold the full disclosure of the 'best mode contemplated by the inventor,' which will result in a contribution to the common good upon expiration of the monopoly is the 'selfish desire' against which 35 U.S.C. § 112 is directed." (Citations omitted).

The patent disclosure herein does not conform with its best commercial structure because the disclosure does not include the sawtooth and detent used to give partition stability, an extremely important feature of the dispenser. Examination of the upper grooves of the Trans-World dispenser (most easily done by running a narrow instrument along the upper inside grooves) reveals that the upper surface of the grooves has a sawtooth configuration. Correspondingly, one corner of the upper end of the partitions has a small protruding portion (a "detent") made to engage with those sawteeth.

The sawteeth and detents were added because the partitions had a tendency to slide along the grooves and topple, thereby making assembly difficult and making it likely that the partitions would not hold their position unless fully filled with film boxes. (Driggs Depos. at 37; Tr. at 238–39; Engel Depos. at 48). To solve this problem, the upper surface of the upper grooves was given a sawtooth or ratchet shape and the upper tongue of the divider was given a detent extending upwardly to engage with the sawteeth. This helped to give stability to the dividers and hold them more positively in position. Trans-World claims that the detent and sawtooth arrangement was added just after filing the patent application. The court finds to the contrary. A preponderance of the evidence shows that this "best mode" of carrying out the invention existed at least as early as September 1, 1970—more than two months prior to the filing of the patent application.

Accordingly, it seems clear that the Jaquish patent is invalid as obvious in light of the prior art under 35 U.S.C. § 103, which prior art includes the prototype model of September or October 1969, *Timely Products Corporation v. Arron, supra,* 523 F.2d at 302; *Application of Foster,* 52 CCPA 1808, 343 F.2d 980 (1965), *cert. denied,* 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307 (1966), that it is invalid under section 102(b) since it was clearly "on sale . . . more than one year prior to the date of the application for patent . . .," and that it was invalid under section 112 for failing to set forth in any specification "the best mode contemplated by the inventor in carrying out his invention." Accordingly, there would appear to be no necessity of reaching plaintiff's infringement claim and the concomitant requests for an accounting, damages and attorneys' fees.

### Title to the Patent

As a further defense to the claim of infringement, Mechtronics alleges that Trans-World does not have exclusive rights under the patent and, most likely, does not have title at all, title resting with Kodak. This issue is raised because there could be no infringement by Mechtronics selling exclusively to the patent owner. It was raised by Mechtronics on a motion for summary judgment, at which time the court declined to make any finding, although it stated that "[t]he facts asserted by plaintiff, if anything, lead to the conclusion that neither party intended an assignment of the patent." *Trans-World Display Corporation v. Mechtronics, Inc.,* 182 U.S.P.Q. 469, 471 (S.D.N.Y.1974). The Patent Office prosecution history indicates an assignment by Ja-

*Elec., Inc. v. RCL Elec., Inc.,* 448 F.2d 382 (1st Cir. 1973); *Noma Lites Canada Ltd. v. West- inghouse Elec. Corp.,* 399 F.Supp. 243 (D.D.C. 1975); *Columbia Broadcasting Sys., Inc. v. Ze- nith Radio Corp.,* 391 F.Supp. 780 (N.D.Ill. 1975), *modified on other grounds,* 537 F.2d 896 (7th Cir. 1976); *Novelart Mfg. Co. v. Carlin*

*Container Corp.,* 363 F.Supp. 58 (D.N.J.1973); *Intermountain Research & Eng'r Co. v. Hercu- les Incorporated,* 171 U.S.P.Q. 577 (C.D.Cal. 1971); *Indiana Gen. Corp. v. Krystinel Corp.,* 297 F.Supp. 427 (S.D.N.Y.1969), *aff'd,* 421 F.2d 1023 (2d Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 820, 26 L.Ed.2d 91 (1970).

quish to Trans-World. There is insufficient evidence, if any, to support any title or interest other than in Trans-World, and accordingly Mechtronics' defense on this ground must fail.

### Attorneys' Fees

Finally, Mechtronics, as the prevailing party, seeks an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285 on the ground that this is an exceptional case.[13] First, it claims that Trans-World has unclean hands for failure to advise the Patent Office of the facts known to it about the dispenser being "on sale" and about the prior art.[14] Of course, every patent applicant has a duty of absolute candor in its dealings with the Patent Office so that, in these *ex parte* proceedings, the Examiner will have all the knowledge of prior art known to the applicant. *Kingsland v. Dorsey*, 338 U.S. 318, 70 S.Ct. 123, 94 L.Ed. 123 (1949); *Precision Instrument Manufacturing Company v. Automatic Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 S.Ct. 1381 (1945); *Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 881 (2d Cir. 1971). In *Timely Products, supra*, the court not only found the patent unenforceable on the ground of unclean hands, but also invalid on the ground of fraud for suppression of information in the Patent Office proceedings, since the applicant knew that the invention had been conceived, reduced to practice and even offered for sale before he filed his application. 523 F.2d at 298. The *Timely Products* court further considered a distinction between unclean hands and fraud as to proceedings that took place in the Patent Office and concluded that unclean hands can render a patent invalid even in the absence of fraud. 523 F.2d at 297.

In the instant case, the applicant had made a search for prior art patents before filing its application, and found the following patents: *Thayer* 1,003,669; *Olund* 2,208,470; and *Heselov* 3,010,606. (Pl.Interrog.Ans. 5; Tr. 84–85). None of these patents were disclosed to the Patent Examiner, although the Examiner himself found *Olund*. Of these patents *Heselov* is the most illuminating and has already been discussed hereinbefore in regard to the claim of obviousness. It states that one of the purposes is to provide a dispensing rack for cigarettes which will hold "various sizes of cigarette packages." (Def.Exh. G, Col. 1, lines 21–22). The patent shows a gravity-fed cigarette dispenser with a housing (Def. Exh. G–1, Figure 1, Nos. 11 and 12) which has a plurality of separately positionable, unitary partitions. The partitions have mutually perpendicular side and back walls (Def.Exh. G–2, Figures 5 and 6, Nos. 27 and 28), are L-shaped, and can be made of molded plastic parts. (Def.Exh. G, Col. 2, line 4). It should be recalled that Jaquish claim 1 (the sole independent claim) requires as the means for defining adjustable size chambers "a plurality of mutually perpendicular partitions fixed to each other, each of said partitions being so arranged within said housing that one of its partitions defines a side wall and the other of its partitions defines a back wall." (Pl.Exh. 32, Col. 4, lines 41–46). Claim 1 of the Jaquish patent requires L-shaped partitions, and *Heselov* shows them. The applicant argued to the Patent Office that "mutually perpendicular side and back walls . . . fixed to each other" was patentably new. (Def.Exh. I, file history, Amendment of Feb. 16, 1972, p. 3). However, it never told the Patent Office about *Heselov* and the other prior art already discussed hereinbefore, and the Pat-

---

13. Unclean hands *or* fraud on the Patent Office in the course of the patent prosecution renders a case "exceptional" and provides a basis for the discretionary allowance of attorneys' fees under 35 U.S.C. § 285. *Timely Products Corp. v. Arron, supra; Kramer v. Duralite Co.*, 514 F.2d 1076 (2d Cir.), *cert. denied*, 423 U.S. 927, 96 S.Ct. 275, 46 L.Ed.2d 255 (1975); *Kahn v. Dynamics Corp. of America*, 508 F.2d 939 (2d

Cir.), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975).

14. The knowledge of the assignee of the patent, Trans-World, that the dispenser was "on sale" and that Trans-World's patent attorneys had found prior art is imputed to Jaquish, the employee-patentee. *Armour & Co. v. Swift & Co.*, 466 F.2d 767, 779 (7th Cir. 1972).

ent Office never found it out. (Tr. at 335–36). Thus, the Patent Office did not have a movable L-shaped partition before it. Trans-World's argument on the prior art now admits the existence of two-way adjustable L-shaped partitions and simply quibbles as to which side of the unit is the face, *i. e.*, which is flush, ignoring the fact that any structure can be turned around. Furthermore, it is not disputed that the Examiner was never informed that Trans-World had the invention on sale more than a year before the application was filed and that therefore the September or October 1969 model should be considered as part of the prior art.

Second, Mechtronics claims that the applicant knowingly failed to disclose its best mode to the Patent Office. The Court has already found herein that the applicant was aware of the best mode and yet such mode nowhere appears in the patent disclosures.

Finally, Mechtronics argues that Trans-World misled this Court in its opposition to Mechtronics' motion for summary judgment. *Trans-World Display Corporation v. Mechtronics, Inc.*, 182 U.S.P.Q. 469 (S.D. N.Y. April 16, 1974). It is true that at trial it appeared that various statements made in Engel's affidavit opposing summary judgment (Def.Exh. B) were at least misleading (Tr. 113–14, 107–10). However, this Court's decision was handed down prior to *Timely Products*, so that it is hazardous to assume what its decision would have been had it been aware of the misleading nature of the affidavit in question. Furthermore, the Court has now had the benefit of many depositions taken since the denial of summary judgment, together with trial testimony and voluminous exhibits. This is not to say that fraud upon the district court would not cause a case to be "exceptional" under 35 U.S.C. § 285, just as it would in the case of fraud against the Patent Office. Here, however, the Court can find no evidence of intentional fraud against this Court.

The same does not hold true with respect to the applicant's withholding from the Patent Office information of which he was aware. The Court accordingly finds the

case to have been "exceptional" within the meaning of 35 U.S.C. § 285 and awards defendant, as the prevailing party, "reasonable attorney's fees." If the parties are unable to agree upon the amount properly allowable, the matter will be set down for hearing. Submit judgment to be entered in accordance with this opinion, reserving jurisdiction of the case only for the purpose of determining the reasonable attorneys' fees payable to defendant.

So ordered.